**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CALEB AND BROWN PTY. LTD., | |
| Plaintiff, | Case No.: 1:20-cv-08612-LAP |
| v. | |
| JON BARRY THOMPSON, LELAND NOLAN, LEE JASON RATNER, FTL HOLDING LLC, and VOLANTIS ESCROW PLATFORM LLC, | |
| Defendants. | |

**DEFENDANT JON BARRY THOMPSON'S ANSWER**
**TO PLAINTIFF'S COMPLAINT**

Defendant Jon Barry Thompson a/k/a J. Barry Thompson ("Thompson") responds to Plaintiff's Complaint as follows:

**NATURE OF THE ACTION**

1.      **Allegation:** This action arises out of Defendants' racketeering scheme to embezzle funds from Plaintiff and multiple other victims, by fraudulently inducing them to enter into sham transactions orchestrated by Defendants for the purchase of digital currency.

**Response:** Denies the allegations in paragraph 1.

2.      **Allegation:** On these and related grounds, Plaintiff asserts claims under Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962(c), *et seq*., as well as state law claims, and seeks compensatory, treble and/or punitive damages, together with recovery of Plaintiff's attorneys' fees and expenses incurred in this litigation.

> **Response:** Admits that Plaintiff purports to assert claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), *et seq*., as well as state law claims.

1

**JURISDICTION AND VENUE**

3.      **Allegation:** The jurisdiction of this Court is invoked based on 28 U.S.C. §1331, the federal racketeering statute ("**RICO**"), 18 U.S.C. §1964(c), and the doctrines of pendent and supplemental jurisdiction codified in 28 U.S.C. §1367.  Upon information and belief, Defendants conducted a racketeering scheme in interstate commerce, through the use of interstate communication facilities.

**Response:** Denies the allegations in paragraph 3.

4.      **Allegation:** In the alternative, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties hereto, and the amount in controversy exceeds seventy-five thousand U.S. dollars ($75,000.00), exclusive of interest and costs.

**Response:** Denies the allegations in paragraph 4.

5.      **Allegation:** This Court has personal jurisdiction over each of the Defendants pursuant to New York CPLR §§ 301 and/or 302.

**Response:** Denies the allegations in paragraph 5.

6.      **Allegation:** Upon information and belief, Thompson, Nolan, and Ratner (the "**Individual Defendants**") are or were New York residents, conduct business in New York, own or have owned property in New York, and their contacts with the forum are otherwise so extensive as to support general jurisdiction.

**Response:** Denies the allegations in paragraph 6 as to Thompson and denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 as to Nolan and Ratner.

7.      **Allegation:** According to multiple public profiles, Thompson is a former New York resident (at least from 1995 until 2003) and had formerly worked on Wall Street for Lehman Brothers

UBS, AIG, and NatWest.[1] Additionally, Thompson founded a technology company based partially in New York City. Thompson's phone number provided by his attorney in connection with an arbitration with Plaintiff (the "**Stayed Arbitration**") in October 2019 was a New York phone number.[2] Additionally, as further described below, Thompson signed a trade name form for Volantis in New York County.

> **Response:** Denies knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 7, except admits that Thompson founded a technology company in 2004 that was previously based partially in New York City and that Thompson's phone number provided by his attorney in connection with an arbitration in October 2019 had an area code of 917.

8.    **Allegation:** According to Nolan's LinkedIn profile, he is currently located in the "Greater New York City Area." According to documents produced by Thompson in connection with another litigation, Nolan's address is 90 Prince Street, New York, NY.

> **Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8.

9.    **Allegation:** According to Ratner's LinkedIn profile, he is in the "Greater New York City Area" as a "FX/Cryptocurrency Infrastructure Consultant." Upon information and belief, Ratner owned real property and was a long-term New York resident. Upon information and belief, he currently resides in Connecticut.

> **Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9.

10.    **Allegation:** Additionally, upon information and belief, as part of their racketeering scheme, the Individual Defendants – using FTL and Volantis as corporate puppets formed specifically for such purpose – invoked the jurisdiction of this District by inducing Plaintiff and other victims of embezzlement to transfer their funds to a designated New York City bank account of FTL or Volantis,

---

[1] Plaintiff is prepared to make all documents referenced in this Complaint available for the Court upon request.
[2] Plaintiff commenced arbitration against Volantis and Thompson on December 31, 2018 which was stayed on November 25, 2019.

which they purported was an "escrow account." FTL and/or Volantis maintain or maintained more than one bank account in New York City in connection with Defendants' fraudulent scheme.

**Response:** Denies the allegations in paragraph 10.

11.     **Allegation:** According to LinkedIn, FTL had a summer intern in the greater New York City area in 2014. According to Thompson's public profiles, FTL's public activities include a crowdsourcing platform located in New York State.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11.

12.     **Allegation:** Venue is proper pursuant to 28 U.S.C. §1391, as a substantial part of the events giving rise to this action occurred within this District.

**Response:** Denies the allegations in paragraph 12.

## PARTIES

13.     **Allegation:** Caleb and Brown is a cryptocurrency trading and brokerage firm located in Melbourne, Australia.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13.

14.     **Allegation:** Defendant Thompson is one of the orchestrators and primary perpetrators of the racketeering enterprise which is the subject of this action (the "**Enterprise**").  As further alleged below, at all relevant times, Thompson was and continues to be the founder, principal, controlling person, officer, and agent of FTL and Volantis.  At all relevant times, Thompson received and continues to receive income directly and/or indirectly from the racketeering Enterprise.

**Response:** Denies the allegations in paragraph 14 except admits that Thompson was and is an officer and shareholder of FTL and Volantis.

15.     **Allegation:** As further set forth below, Thompson was charged with two counts of commodities fraud and two counts of wire fraud in the Southern District Court of New York (the "**Criminal Action**") related to fraudulent schemes perpetrated against victim companies who sent

millions of dollars to FTL, Volantis, and other corporate Enterprise participants in connection with the sale of Bitcoin.  Thompson was arrested, released on bail.

> **Response:** Denies the allegations in paragraph 15 except admits that Thompson was charged with two counts of commodities fraud and two counts of wire fraud in the Southern District of New York and was subsequently arrested and released on bail.

16.   **Allegation:** On October 1, 2020, as part of a plea bargain, Thompson pled guilty to one count of commodities fraud.  His sentencing is scheduled for January 7, 2021.

> **Response:** Denies the allegations in paragraph 16 except admits that, on October 1, 2020, Thompson pled guilty to one count of commodities fraud, at which time his sentencing was scheduled for January 7, 2021.

17.   **Allegation:** Additionally, as further set forth below, the Commodity Futures Trading Commission ("**CFTC**") filed a complaint against Thompson in the Southern District Court of New York (the "**CFTC Action**") alleging violations of the commodities laws related to the same schemes.

> **Response:** Denies the allegations in paragraph 17 except admits that the Commodity Futures Trading Commission filed a complaint against Thompson in the Southern District of New York.

18.   **Allegation:** Thompson entered into a Consent Order for Permanent Injunction and Other Equitable Relief (the "**CFTC Consent Decree**") with the CFTC, which was so-ordered by the Court on October 1, 2020.  In the CFTC Consent Decree, Thompson consented to the continuing jurisdiction of the Southern District Court of New York for all purposes related to the CFTC Action "even if Defendant now or in the future resides outside the jurisdiction of this Court." Upon information and belief, Thompson currently resides in Pennsylvania.

> **Response:** To the extent the allegations of paragraph 18 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document, and admits that Thompson currently resides in Pennsylvania.

19.   **Allegation:** Upon information and belief, Nolan is another orchestrator and a willful participant of the Enterprise which is the subject of this action.  As further alleged below, at all relevant times, Nolan was and continues to be one of the founders, principals, controlling persons, officers, and

agents of FTL and Volantis. Upon information and belief, at all relevant times, Nolan received and continues to receive income directly and/or indirectly from the racketeering Enterprise.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19.

20.     **Allegation:** According to his LinkedIn profile, Nolan is a "Juris Doctor" from The John Marshall Law School and had studied at the University of Chicago Law School.  According to the Attorney Registration & Disciplinary Commission of the Supreme Court of Illinois, Nolan was admitted as an attorney but is not authorized to practice law in Illinois.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20.

21.     **Allegation:** Upon information and belief, Ratner is another orchestrator and a willful participant of the Enterprise which is the subject of this action.  As further alleged below, at all relevant times, Ratner was and continues to be one of the founders, principals, controlling persons, officers and agents of FTL and Volantis. Upon information and belief, at all relevant times, Ratner received and continues to receive income directly and/or indirectly from the racketeering Enterprise.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21.

22.     **Allegation:** As further alleged below, Thompson purports that FTL is a Delaware limited liability company and Volantis is a "Series LLC" of FTL located in Pennsylvania (FTL and Volantis referred to herein as "**Corporate Defendants**").

**Response:** Denies the allegations in paragraph 22 except admits that FTL is a series limited liability company and Volantis is a sub-series limited liability company.

23.     **Allegation:** According to a former website called http://www.volantisescrow.com/, Volantis is an invitation only platform for facilitation of OTC (over-the-counter) transactions focused on commodity and complex multi-asset transactions and provides custodial and execution services.

**Response:** Admits the allegations in paragraph 23.

6

24.     **Allegation:** Upon information and belief, the Individual Defendants formed, at all relevant times operated, and continue to use the Corporate Defendants, as well as multiple other corporate entities, "Series" companies, and corporate shells, for the specific purpose of perpetrating racketeering activities further to their Enterprise.

**Response:** Denies the allegations in paragraph 24.

25.     **Allegation:** Upon information and belief, the Individual Defendants direct, control, run, and/or willfully participate in the racketeering Enterprise as more fully described below. The Individual Defendants worked in concert to cause the racketeering Enterprise at issue to engage in the misconduct described in this Complaint, directed the Enterprise to consummate the unlawful transactions described herein, and each of the Individual Defendants has personally profited from those activities.

**Response:** Denies the allegations in paragraph 25.

## FACTUAL ALLEGATIONS

### I.   The Escrow Services Agreement

26.     **Allegation:** On or about June 22, 2018, Caleb and Brown executed an Escrow Services Agreement with Thompson on behalf of Volantis (the "**Escrow Agreement**" attached hereto as **Exhibit A**) for purchase by Plaintiff of digital currency, namely Bitcoin, to be obtained by Volantis.

> **Response**: To the extent the allegations of paragraph 26 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

27.     **Allegation:** On June 23, 2018, Thompson acknowledged receipt of the signed Escrow Agreement, sent Caleb and Brown a welcome package (the "**Welcome Package**" attached hereto as **Exhibit B**), and proposed to hold a kickoff call.

> **Response:** To the extent the allegations of paragraph 27 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

28.     **Allegation:** The Welcome Package provides the following bank (the "**NYC Bank**

**Account**") for both "US Fedwire" and "SWIFT," where Plaintiff's funds were to be sent.

| | |
|---|---|
| Bank | Citibank NY |
| Beneficiary Name | Morgan Stanley |
| Address | 1585 Broadway<br>New York, NY 10036 |

**Response:** To the extent the allegations of paragraph 28 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

29.    **Allegation:** The address is the Morgan Stanley Building and it is the bank's global headquarters.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29.

30.    **Allegation:** The Escrow Agreement contains the following Representations and Warranties:

  a.    Company [Volantis] is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Company has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Company of this Agreement, the performance by Company of its obligations hereunder and the consummation by Company of the transactions contemplated hereby have been duly authorized by all requisite Company action on the part of Company.

  b.    This Agreement has been duly executed and delivered by Company and (assuming due authorization, execution and delivery by Customer), this Agreement constitutes a valid and legally binding obligation of Company, enforceable against Company in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally.

*See* Exhibit A § 4(a) and (b).

**Response:** To the extent the allegations of paragraph 30 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

31.    **Allegation:** Upon information and belief, Volantis is not a real Delaware LLC but merely

a façade or instrument used by Defendants further to their fraudulent scheme.

**Response:** Denies the allegations in paragraph 31.

32.    **Allegation:** The Escrow Agreement was entered into by Caleb and Brown to facilitate its purchase of Bitcoin from Volantis, for its own and its clients' accounts, in a secure manner which would protect Caleb and Brown's funds from embezzlement, misappropriation, conversion, theft, and other forms of counterparty risk.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32.

33.    **Allegation:** Specifically, Section 1(a) of the Escrow Agreement, titled "Escrow Services" provides that "[a]t the sole direction and benefit of the Customer, Company may hold Assets as defined below.

> i.    Company shall hold Assets for Customer [Caleb and Brown] at customer's discretion and direction,
>
> ii.    Customer may instruct the Company to exchange any Assets held in the Escrow Service between Fiat Currency and Cryptocurrencies . . . ,
>
> iii.    Customer may instruct the Company to release Assets from Escrow in to accounts (or wallets) owned by the Customer,
>
> iv.    All Assets sent to the Company's Escrow Service and all Assets returned to the Customer from Escrow shall be sent from or into and [*sic*] account or Wallet owned by the Customer or one of its affiliates.

*See* Exhibit A § 1(a).

**Response:** To the extent the allegations of paragraph 33 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

34.    **Allegation:** Additionally, Section 1(b)(v) of the Escrow Agreement provides that "[u]nless Customer instructs otherwise, in the event a customer Order is not confirmed within the Review Period, Customer shall have the right to terminate such Order in Customer's sole discretion." *Id.* at § 1(b).

**Response:** To the extent the allegations of paragraph 34 seek to paraphrase or characterize the

contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

35.    **Allegation:** Moreover, Section 4(f) provides that "Company is the lawful owner of each Company Wallet and has good title thereto.  Each Company Wallet is owned and operated solely for the benefit of Company, and no Person, other than Company, has any right, title or interest in any Company Wallet." *Id.* at § 4(f).

**Response:** To the extent the allegations of paragraph 35 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

36.    **Allegation:** The Escrow Agreement contains a warranty that the "Company maintains general business insurance with liability coverage up to Fifty Million Dollars ($50,000,000.00)." *Id.* at § 4(h).

**Response:** To the extent the allegations of paragraph 36 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

 *A. First Wire Transfer*

37.    **Allegation:** On or about June 28, 2018, Caleb and Brown wired $100,000.00 to the NYC Bank Account specified in the Escrow Agreement.  Per the Escrow Agreement, these funds were supposed to be deposited in Caleb and Brown's individual escrow account or "wallet" at Volantis.

**Response:** Admits the allegations in paragraph 37.

38.    **Allegation:** On or about June 29, 2018, pursuant to a purchase order that Caleb and Brown placed with Volantis -- according to the procedure set forth in the Escrow Agreement – Caleb and Brown successfully purchased 16.405 Bitcoin or BTC from Volantis.

**Response:** Admits the allegations in paragraph 38.

 *B. The Second Wire Transfer*

39.    **Allegation:** On or about July 23, 2018, Caleb and Brown transferred an additional $700,000.00 into "escrow" to the NYC Bank Account.

**Response:** Admits the allegations in paragraph 39.

40.    **Allegation:** On or about July 27, 2018, pursuant to another purchase order that Caleb and Brown placed with Volantis (again, according to the procedure set forth in the Escrow Agreement), Caleb and Brown successfully purchased 44.4083 BTC from Volantis. The purchase price for the Bitcoin was $343,250.94.

**Response:** Admits the allegations in paragraph 40.

### C. *The Third and Fourth Wire Transfers*

41.    **Allegation:** On or about August 2, 2018, in anticipation of another Bitcoin purchase (the "**August Purchase**"), Caleb and Brown transferred an additional $350,025.00 to Volantis in two separate wire transfers to the NYC Bank Account. The August Purchase was never completed.

**Response:** Admits the allegations in paragraph 41.

### D. *Caleb and Brown Demand Refund*

42.    **Allegation:** On or about August 7, 2018, Caleb and Brown began requesting that Volantis and Thompson return Caleb and Brown's funds. On that date, Caleb and Brown had $706,742.72 "escrowed" with Volantis.

**Response**: Denies the allegations in paragraph 42, except admits that on or about August 7, 2018, Caleb and Brown requested the return of funds.

### E. *Partial Refund by Volantis*

43.    **Allegation:** On August 8, 2018, Volantis or Thompson wired $306,742.72 to Caleb and Brown, which left a balance of exactly $400,000.00 in Caleb and Brown's Volantis escrow account.

**Response:** Admits the allegations in paragraph 43.

44.    **Allegation:** Thereafter, Caleb and Brown demanded that Volantis return its remaining $400,000.00.  Thompson never contested that such funds were owed to Plaintiff.

**Response:** Denies the allegations in paragraph 44, except admits that Caleb and Brown sought return of the $400,000.00 from Volantis.

### F. Failure to Refund Escrowed Funds and Thompson's Multiple Excuses

45.     **Allegation:** In response to Caleb and Brown's demand to return the $400,000.00, Thompson advised that he "accidentally" entered Plaintiff's funds into a trade without its knowledge or consent due to problems in his "back office."

**Response:** Denies the allegations in paragraph 45.

46.     **Allegation:** Throughout August, Thompson repeatedly promised to send the funds to Plaintiff shortly, but never did.

**Response:** Denies the allegations in paragraph 46.

47.     **Allegation:** In a litigation in the Eastern District of Pennsylvania (5:18-cv-03904-JFL) (the"**Symphony Litigation**") against Thompson brought by another victim of Defendants' Enterprise, Symphony FS Limited ("**Symphony**"), Thompson produced Proposed Findings of Fact relating to a preliminary injunction motion wherein he claimed to have commingled Caleb and Brown's escrowed funds with funds of Symphony without Caleb and Brown's authorization. Specifically, he stated that in July of 2018, Volantis initiated a purchase of the 544 Bitcoin that Volantis intended to provide to Symphony (500 coins) and Caleb and Brown (44 coins), and that the seller of the Bitcoin allegedly absconded with the funds. *See* **Document 48**[3] ¶¶ 25, 30.

> **Response:** To the extent the allegations of paragraph 47 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document, and admits that Thompson was named as a defendant in a litigation in the Eastern District of Pennsylvania with Docket No. 5:18-cv-03904-JFL.

48.     **Allegation:** The Escrow Agreement provides in Section 4(e) that "[w]ith respect to any Customer Purchased Cryptocurrency, Company sells, transfers and delivers to Customer under any Customer Order, Company is the lawful owner of such Customer Purchased Cryptocurrency with good

---

[3] The citations to "**Documents**" throughout this Complaint refer to documents uploaded to the Electronic Filing (CM/ECF) system of the United States Courts for the civil actions referenced herein.

and marketable title thereto, and Company has the absolute right to sell, assign, convey, transfer and deliver such Customer Purchased Cryptocurrency. Such Customer Purchased Cryptocurrency is free and clear of all security interests, liens, pledges, claims (pending or threatened), charges, escrows, encumbrances or similar rights." *See* Exhibit A § 4(e).

> **Response:** To the extent the allegations of paragraph 48 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

49.     **Allegation:** Volantis and Thompson violated this provision of the Escrow Agreement if the Plaintiff's funds were commingled with Symphony's.

**Response:** Denies the allegations in paragraph 49.

50.     **Allegation:** Additionally, Thompson made an empty promise to personally repay Caleb and Brown "out of [his] pocket." On August 30, 2018, Plaintiff accepted Thompson's offer to personally pay Plaintiff the $400,000 within three (3) days. Thompson contended that he had sold bonds in order to accomplish this payment. Unsurprisingly, no funds were received from Thompson after three (3) days, nor anytime thereafter.

**Response:** Denies the allegations in paragraph 50.

51.     **Allegation:** On October 3, 2018, Plaintiff's counsel, Mr. Seth Kaplowitz sent an email to Thompson on behalf of Caleb and Brown demanding the return of Caleb and Brown's funds along with costs incurred by Caleb and Brown in seeking to recover its money.

**Response:** Admits the allegations in paragraph 51.

52.     **Allegation:** As of today, Caleb and Brown's $400,000.00 – which was required to be held in escrow -- remains outstanding and due and owing.

**Response:** Denies the allegations in paragraph 52.

## II. The Symphony Litigation and Documents Produced by Thompson Raise Red Flags

53.     **Allegation:** In connection with the Symphony Litigation, Thompson produced various

documents which raised red flags regarding the legitimacy of Defendants' "business" scheme.

**Response:** Denies the allegations in Paragraph 53.

54. **Allegation:** Among other improprieties, the documents demonstrate, on their face, that Volantis was never properly formed, or at the very least, did not exist as of the date of the Escrow Agreement.

**Response:** Denies the allegations in Paragraph 54.

55. **Allegation:** The complaint filed by Symphony alleges that Symphony and Thompson (in the guise of Volantis) executed an Escrow Services Agreement (**Document 1**, ¶ 11), that Symphony wired €3,600,000.00 (more than $4,100,000.00) into what Symphony believed was its escrow account with Volantis to fund Symphony's acquisition of 500 BTC (*id.* ¶19), and that Thompson absconded with the funds and never delivered Bitcoin to Symphony (*id.* ¶¶22, 35).

> **Response:** To the extent the allegations of paragraph 55 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

### A. Corporate Formation Documents

56. **Allegation:** According to Thompson's assertions in the Symphony Litigation, Volantis was created as one of several other "Series LLCs" of FTL.

**Response:** Admits the allegations in paragraph 56.

57. **Allegation:** Thompson produced FTL's Limited Liability Company Agreement dated as of *July 24, 2017* (the "**FTL LLC Agreement**"). *See* **Document 21-1**.

> **Response:** Denies the allegations in paragraph 57, except admits that Thompson produced a Limited Liability Company Agreement for FTL dated July 24, 2017.

58. **Allegation:** The FTL LLC Agreement provides that Thompson and Nolan are "Company Members" and "Managers" of FTL and that Thompson is FTL's "Managing Director" and Nolan is FTL's "Secretary." FTL LLC Agreement §§ 1.01(h), 5.01, and signature page.

> **Response:** To the extent the allegations of paragraph 58 seek to paraphrase or characterize the

contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

59.     **Allegation:** The FTL LLC Agreement states that Thompson holds 2,250 of the total 2,500 authorized "Voting Units" or [*sic*] FTL and 7,250 out of the total of 7,500 authorized "Non-Voting Units" of FTL. FTL LLC Agreement § 8.05(b).

**Response:** To the extent the allegations of paragraph 59 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

60.     **Allegation:** The FTL LLC Agreement states that Nolan holds 250 of the total 2,500 authorized "Voting Units" of FTL and 250 out of the total of 7,500 authorized "Non-Voting Units" of FTL. FTL LLC Agreement § 8.05(b).

**Response:** To the extent the allegations of paragraph 60 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

61.     **Allegation:** The FTL LLC Agreement provides that Thompson and Nolan "***may establish*** one or additional Series in their sole discretion by having the majority of existing Company Members execute a Separate Series Agreement.  The terms of each additional Series shall be set forth in a separate agreement setting forth such Series." FTL LLC Agreement § 2.01(c) (emphasis added).

**Response:** To the extent the allegations of paragraph 61 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

62.     **Allegation:** The FTL LLC Agreement contains a "Series List" as an exhibit consisting of a chart of 4 or 5 "Series"[4] operating from Pennsylvania[5] with different "DBAs":

| Series Name | EIN | DBA | Operating Address |
| --- | --- | --- | --- |
| FTL Holding LLC | xx-xxx6366 | FTL Holding LLC | 131W. Burke St, Easton PA 18042 |
| Carbon Trading | xx-xxx1271 | FTL Holding, Carbon Trading LLC | 131W. Burke St, Easton PA 18042 |
| Series 6 | xx-xxx4192 | FTL Holding, Series 6 LLC | 131W. Burke St, Easton PA 18042 |

---

[4] It is unclear whether FTL lists itself as a "Series."
[5] The address - 131W. Burke St, Easton PA 18042 – was an address for Thompson provided by his counsel to the Jams Arbitrator in the Stayed Arbitration in October of 2019.

| Volantis Escrow Platform | xx-xxx8995 | Volantis Escrow Platform LLC | One W. Broad St. Bethlehem, PA 18018 |
|---|---|---|---|
| Investments | | FTL Holding Investments LLC | 131W. Burke St, Easton PA 18042 |

*See* Ex. A of FTL LLC Agreement.

> **Response:** To the extent the allegations of paragraph 62 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

63. **Allegation:** The FTL LLC Agreement produced by Thompson appears to have his signature as FTL's "Managing Member" but not Leland Nolan's – FTL's purported "Member" and "Secretary."

> **Response:** To the extent the allegations of paragraph 63 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

64. **Allegation:** Thompson also produced a "**Separate Series Agreement**" for Volantis. *See* **Document 21-2**.

> **Response:** Admits the allegations in paragraph 64.

65. **Allegation:** The Separate Series Agreement identifies FTL and Defendant Ratner, as "Series Members."

> **Response:** To the extent the allegations of paragraph 65 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

66. **Allegation:** The Recitals provide:

THIS SEPARATE SERIES AGREEMENT, dated as of the **16th day of August, 2018**[6] is entered into by and between FTL Holding LLC and Lee Ratner, as "Series Members" associated with the **newly created** "Series" identified below and other Members hereto contributing capital hereunder or as may be agreed by the Series Members, and Barry Thompson and Leland Nolan as "Company Members" of FTL . . . .

WHEREAS, it is **intended** by the parties hereto to create an additional Series with respect to Separate Property in the form of the New Series with such Separate Property being more particularly described as follows: **Various Property to be Determined.**

---

[6] The Escrow Agreement is dated June 14, 2018 – *two months prior to the creation of this document*.

*See* Separate Series Agreement Recitals (emphasis added).

> **Response:** To the extent the allegations of paragraph 66 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

67.     **Allegation:** The Separate Series Agreement also states:

> 12.     <u>New Series</u>. In accordance with Section 2.01 of the LLC Agreement, the Company Members ***hereby creates*** [*sic.*] the New Series, which shall be a "Series" for purposes of the LLC Agreement. The purpose of this Series shall be investment purposes, and any other purpose that the Series Members deem necessary or appropriate pursuant to the Act, LLC Agreement, or this Separate Series Agreement as may be amended from time to time.

> 13.     <u>Name of New Series</u>. The name of the New Series created by this Separate Series Agreement shall he: ***FTL Holding, Volantis LLC*** with a DBA <u>***to be filed***</u> in the name of ***Volantis Escrow Platform LLC.***

Separate Series Agreement §§ 12, 13 (emphasis added).

> **Response:** To the extent the allegations of paragraph 67 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

68.     **Allegation:** The formation documents therefore undisputedly demonstrate that **<u>as of August 16, 2018, Volantis's DBA had not yet been filed in Delaware as a FTL Series</u>.** Logically then, Thompson's own documentary proof supports the legal conclusion that Volantis **<u>did not exist on June 14, 2018</u>** -- the time of the formation of the Escrow Agreement.

> **Response:** Denies the allegations in paragraph 68.

69.     **Allegation:** The Separate Series Agreement contains the following chart of "Percentage/Membership Units":

| | Non Voting Units | Voting Units | Voting % | Total Units | Participation % |
|---|---|---|---|---|---|
| FTL Holding LLC | 1,300.0 | 1,250.0 | 50.0% | 2,550.0 | 30.7% |
| Lee Ratner | 1,250.0 | 1,250.0 | 50.0% | 2.500.0 | 30.1% |
| XNUMIA, LLC | 400.0 | - | 0.0% | 400.0 | 4.8% |
| Dan Morran | 400.0 | - | 0.0% | 400.0 | 4.8% |
| Aymerich, LLC (Lee Nolan) | 2,450.0 | | 0.0% | 2,450.0 | 29.5% |

Separate Series Agreement § 21.

> **Response:** To the extent the allegations of paragraph 69 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

70.     **Allegation:** The Separate Series Agreement appears to be signed by the following "Company Members":

- FTL by Thompson – Title: Managing Director
- Aymerich, LLC by Nolan – Title: Managing Director
- XNUMIA, LLC by Nolan – Title: Managing Director
- Lee Ratner – Title: Director

*Id.* at signature page.

> **Response:** To the extent the allegations of paragraph 70 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

71.     **Allegation:** The Separate Series Agreement is also signed by Thompson as Managing Director of FTL as "Majority Series Member[]." *Id.*

> **Response:** To the extent the allegations of paragraph 71 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

72.     **Allegation:** In addition to the FTL LLC Agreement and the Separate Series Agreement, Thompson produced a document in the Symphony Litigation titled "Certificate of Amendment of FTL" dated as of ***May 2, 2017*** – predating the FTL LLC Agreement (the "**Certificate of Amendment**") purporting to amend the certificate of formation of FTL to designate it as a Series LLC "***which may establish designated series***." **Document 21-4**.  It was signed by Thompson as an "Authorized Person."

> **Response:** To the extent the allegations of paragraph 72 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document, and admits that Thompson produced a document in the Symphony Litigation titled "Certificate of Amendment of FTL" dated as of May 2, 2017.

18

73.    **Allegation:** The Certificate of Amendment establishes that Volantis had not been established as of May of 2017. The FTL LLC Agreement establishes that Volantis was not yet formed in July 2017.  And, the Separate Series Agreement establishes that Volantis did not exist in August of 2018.

    **Response:** Denies the allegations in paragraph 73.

74.    **Allegation:** Thompson also produced a confirmation of EIN from the IRS (the "**EIN Confirmation**") for an entity designated as "FTL HOLDING VOLANTIS ESCROW PLATFORM, % FTL HOLDING LLC MBR" with an address of "131 W BURKE ST, EASTON, PA 18042."   It is unclear from this document whether the EIN belongs to FTL or a separate Series as the names of the two are combined. **Document 21-5**.

    **Response:** Denies the allegations in paragraph 74 except admits that Thompson produced a confirmation of EIN from the IRS for an entity designated as "FTL HOLDING VOLANTIS ESCROW PLATFORM, % FTL HOLDING LLC MBR" with an address of "131 W BURKE ST, EASTON, PA 18042."

75.    **Allegation:** Thomson testified at his deposition in the Symphony Litigation that FTL and Volantis have "the same federal ID," *see* Thompson Oct. 24, 2018 Dep. Tr. 291:17-18 (**Document 43-3**), however the FTL LLC Agreement provides for different EINs for FTL and Volantis. *See* FTL LLC Agreement Ex. A.

    **Response:** To the extent the allegations of paragraph 75 seek to paraphrase or characterize the contents of written documents, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with the documents.

76.    **Allegation:** The date of the EIN Confirmation is "***06-02-2017***" – ***before*** the August 16, 2018 Separate Series Agreement purporting to form Volantis and even ***before*** the July 24, 2017 FTL LLC Agreement.

    **Response:** Denies the allegations in paragraph 76, except admits that the date of the EIN Confirmation is June 2, 2017.

77.    **Allegation:** Moreover, the address in the EIN Confirmation (*i.e.*, Thompson's address)

is different from the "Operating Address" designated for Volantis in the FTL LLC Agreement.

**Response:** Admits the allegations in paragraph 77.

78.     **Allegation:** Finally, an EIN filing does not operate to create a valid DBA under Delaware law.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78.

79.     **Allegation:** In fact, not a single document publicly available or produced by Thompson in the Symphony Litigation or elsewhere demonstrates that the Volantis DBA was **ever** validly formed under Delaware law. According to Delaware law, in order to validly transact business under a DBA like Volantis, the company must file a registration in the Office of the Prothonotary of each county of Delaware where it conducts business. *See* Title 6 Del. C. Chapter 31 § 3101 and § 3103.

**Response:** Paragraph 79 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 79.

80.     **Allegation:** Conducting a simple search on the Delaware Courts' search of Trade, Business, and Fictitious Names database (https://courts.delaware.gov/tradenames/) reveals that no entity containing the name "Volantis" has ever been registered with any Delaware Prothonotary.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80.

81.     **Allegation:** Thompson also produced a form which purports to be the "Registration of Trade, Business & Fictitious Name Certificate" for "Volantis Escrow Platform." (the "**Trade Name Form**" **Document 21-6).**

**Response:** Denies the allegations in paragraph 81, except admits that Thompson produced a "Registration of Trade, Business & Fictitious Name Certificate" for "Volantis Escrow Platform."

82.     **Allegation:** The Trade Name Form lists "FTL Holding, LLC, Volantis Series" as the "Person, Firm or Association (*Parent Company, if applicable*)." It also lists the following "Names and addresses of ALL owners, members, or partners comprising the business":

| Last Name | First Name | Address |
|-----------|-----------|---------|
| Thompson | J. Barry | 131 W. Burke St. Easton PA 18042 |
| Nolan | Leland | 90 Prince St, 8th Fl, NY, NY 10012 |
| Ratner | Lee | 66 Butler Lane, New Canaan, CT 06840 |

**Response:** To the extent the allegations of paragraph 82 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

83.     **Allegation:** The "Nature of Business" identified in the Trade Name Form is "Transaction Facilitation."  It was apparently signed by Thompson before a notary *in New York County* on *September 16, 2018* – over *two months after* the Volantis' purported execution of the Escrow Agreement.[7]

**Response:** To the extent the allegations of paragraph 83 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document, and admits that Thompson signed a "Registration of Trade, Business & Fictitious Name Certificate" in New York County on or about September 16, 2018.

84.     **Allegation:** Despite the Trade Name Form produced by Thompson, the publicly-available search results demonstrate that no such form was actually filed with the Delaware Prothonotary's office.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84.

85.     **Allegation:** Thompson's deposition testimony confirms that he took "*No*" "steps with regard to the change of name besides *simply putting a new name* on the August 2018 [Separate Series Agreement]." *See* Thompson Oct. 24, 2018 Dep. Tr. 291:23-24- 291:1-2 (**Document 43-3**).

**Response:** To the extent the allegations of paragraph 85 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

86.     **Allegation:** Because a DBA filing was required under Delaware law and was not accomplished by FTL, Volantis has not been properly formed as a Series/DBA of FTL. Volantis did not

---

[7] According to its complaint, Symphony's Escrow Services Agreement was entered into on July 18, 2018, which also predates that Trade Name Form.

exist at the time of the Escrow Services Agreement and has still not been properly filed as a DBA in Delaware.

> **Response:** Paragraph 86 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 86.

### B. The KYC Information Sheet

87.    **Allegation:** Thompson also produced a letter he sent to Symphony's Chief Executive Officer attaching the "KYC" (know your customer) information sheet. **Document 15-1** (the "**KYC Sheet**").  The cover letter from Thompson states:

> I personally represent and warrant, **under penalty of perjury**, that to my personal knowledge all of the information provided in this document is substantially complete and true and correct. Further, I represent and warrant that I have actual legal authority to sign this document on behalf of Volantis Escrow Platform LLC. I hereby agree to notify the Provider if the information which has been supplied changes in any manner.

See **Document 15-1** (emphasis added).

> **Response:** To the extent the allegations of paragraph 87 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document, and admits that Thompson produced a letter attaching the "KYC" (know your customer") information sheet.

88.    **Allegation:** The KYC Sheet provides that the "Full Name of the Corporation" is "Volantis Escrow Platform LLC (**an FTL Holding Company**)." Id. (emphasis added). This contradicts Thompson's position that Volantis is a "Series LLC" of FTL – not a holding company of FTL.

> **Response:** To the extent the allegations of paragraph 88 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

89.    **Allegation:** Additionally, the KYC Sheet states that the "Date of Incorporation" is "6-April-2011 (Series Volantis - Created May 2nd, 2017)." This contradicts the date of the Separate Series Agreement purporting to create Volantis – which is August 16, 2018.

> **Response:** To the extent the allegations of paragraph 89 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

90.     **Allegation:** The KYC Sheet identifies Thompson as Volantis' "Managing Director" and lists Thompson, Nolan, and Ratner as Volantis' "Officers."

> **Response:** To the extent the allegations of paragraph 90 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

91.     **Allegation:** The KYC Sheet also identifies the following "shareholders owning more than 25% of all outstanding shares of Corporation": FTL Holding LLC, Aymerich, LLC [Nolan's company], and Lee Jason Ratner.

> **Response:** To the extent the allegations of paragraph 91 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

92.     **Allegation:** The "Contact Information" for Volantis provided in the KYC sheet lists two New York phone numbers – the "Mobile Number" belonging to Thompson.

> **Response:** To the extent the allegations of paragraph 92 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

93.     **Allegation:** Although poorly crossed out with a black marker, the "Bank Name" in the KYC is Morgan Stanley. The "Account Name" is "Volantis Escrow Platform (FTL)." Thompson is listed as the "Authorized Account Signatory."

> **Response:** To the extent the allegations of paragraph 93 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

### C. The Bank Interrogatories

94.     **Allegation:** Thompson also produced interrogatory responses prepared by Morgan Stanley (the "**Morgan Stanley Interrogatories**")[8] which identified three (3) bank accounts "owned solely or in part by" Volantis or Volantis Market Making LLC – another purported "Series LLC"of FTL

---

[8] The Morgan Stanley Interrogatories were provided by Thompson's counsel to Caleb and Brown's counsel in the Stayed Litigation.

("**Volantis Market**").

> Account Number XXX-XX3259-549 $18.68

> Account Number XXX-XX2161-549 $12.50

> Account Number XXX-XX2128-549 $0.59

> **Response:** To the extent the allegations of paragraph 94 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

95.      **Allegation:** The XXX-XX2161-549 account is the one identified in Caleb and Brown's Welcome Package and the same bank account to which Symphony wired its funds. *See* **Exhibit B** hereto and **Document 1-1** in the Symphony Litigation.[9]

> **Response:** To the extent the allegations of paragraph 95 seek to paraphrase or characterize the contents of written documents, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with the documents.

96.      **Allegation:** The Morgan Stanley Interrogatories were provided in connection with a garnishment by yet another victim of Defendants -- Iterative OTC, LLC – which obtained a Jams arbitration award against Volantis and Volantis Market in Philadelphia County.

> **Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96.

### III. Thompson's and Leland's Statements and Correspondence
### Lend Further Support of Embezzlement Scheme

97.      **Allegation:** Thompson and Nolan's statements, including communications with and through counsel and sworn testimony, lend support to the Enterprise and shifting of funds from "clients" to various accounts.

> **Response:** Denies the allegations in paragraph 97.

98.      **Allegation:** The Proposed Findings of Fact Thompson produced relating to a preliminary

---

[9] Additionally, contrary to the Morgan Stanley Interrogatories, Thompson misrepresented in the Welcome Package sent to Caleb and Brown that the escrow account belonged solely to Volantis.  According to the Criminal Action and the CFTC Action, the account belongs to FTL.

injunction motion in the Symphony Litigation confirm that he conceded to illicitly commingling Caleb and Brown's "escrowed" funds with Symphony's "escrowed" funds.

> **Response:** To the extent the allegations of paragraph 98 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

99.    **Allegation:** Specifically, Thompson stated that in July of 2018 Volantis initiated a purchase of the 544 Bitcoin that Volantis intended to deliver to Symphony - (500 coins) and Caleb and Brown (44 coins) and that the seller of the Bitcoin allegedly absconded with the funds. *See* **Document 48** ¶¶ 25, 30.

> **Response:** To the extent the allegations of paragraph 99 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

100.    **Allegation:** Additionally, Thompson "transferred $300,000 to the escrow account of his counsel, Holland & Knight on **October 12, 2018** because he believed that $300,000 reflected funds potentially belonging to Symphony." *Id*. at ¶ 42.  The transfer was apparently made, albeit late, pursuant to a Temporary Restraining Order ("**TRO**") in the Symphony Litigation.

> **Response:** To the extent the allegations of paragraph 100 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

101.    **Allegation:** However, when Thompson was negotiating a potential settlement with Caleb and Brown's counsel, Mr. Seth Kaplowitz (which never came to fruition) in response to counsel's request to provide proof of availability of funds, Thompson sent a screenshot of a "VEP [Volantis Escrow Platform] Failed Suspense" account with Morgan Stanley showing a balance of almost **$670,000** as of the same date as his transfer of $300,000 to Holland & Knight -- **October 12, 2018** – and moreover indicating a deposit of approximately $400,000 on such date. *See* screenshot and cover email attached as **Exhibit C** hereto.

> **Response**: To the extent the allegations of paragraph 101 seek to paraphrase or characterize the contents of written documents, the documents speak for themselves and Thompson denies the

allegations to the extent that they are inconsistent with the documents.

102.    **Allegation:** Thompson's October 15, 2018 cover email to Mr. Kaplowitz states "this was printed on Friday COB as ***we placed the funds in the suspense account from C&B's***." *Id.* (emphasis added).

> **Response:** To the extent the allegations of paragraph 102 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

103.    **Allegation:** Thompson further stated "I am prohibited on return of capital due to pending arbitration between the parties and court case. ***I NEED a letter asking for relief so I can return the funds***. ***They are queued to be returned***. Can you please assist in providing that letter so we can get these funds released." *Id.* (emphasis added). "***I need a relief letter / request from you*** the arbiter / judge in this matter allowing return of capital. That's it. Cash is on hand and I ***can return as soon as I have permission to do so***." *Id.* (emphasis added). When Mr. Kaplowitz requested that Thompson provide a draft of the letter which Thompson needs to release Caleb and Brown's funds, Thompson never responded.

> **Response:** To the extent the allegations of paragraph 103 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

104.    **Allegation:** Thompson's Proposed Findings of Fact in the Symphony Litigation also provide that Thompson withheld an additional $150,000 which he believed were owed for cetain [*sic*] commissions in connection with its deal with Symphony. **Document 48** ¶ 42.

> **Response:** To the extent the allegations of paragraph 104 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

105.    **Allegation:** The Proposed Findings of Fact also state that Thompson produced an "omnibus statement of accounts maintained at Morgan Stanley . . . [of] transactions undertaken between September 14, 2018 . . . and October 26, 2018" including the $300,000 transfer to Holland & Knight –

which "funds were . . . profits generated by Volantis between September 14 and October 12." *Id.* ¶ 49.

> **Response:** To the extent the allegations of paragraph 105 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

106.    **Allegation:** Thompson has therefore provided conflicting stories regarding whose funds were in Volantis' account on October 12, 2018 – funds belonging to Caleb and Brown as he represented to Mr. Kaplowitz, funds belonging to Symphony as he represented to Symphony, funds subject to commissions to finders, or funds generated by Volantis as profits.

> **Response:** Denies the allegations in paragraph 106.

107.    **Allegation:** At a preliminary conference held on April 23, 2019 in the Stayed Arbitration, Thompson's counsel, Mr. Soven inexplicably advised that Volantis was **insolvent!**

> **Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107.

108.    **Allegation:** Counsel had difficulty explaining what happened to the funds in Volantis' failed suspense and other accounts.  In other words, the $400,000 belonging to Caleb and Brown in Volantis' failed suspense account on October 12, 2018 were simply gone.

> **Response:** Denies the allegations in paragraph 108.

109.    **Allegation:** It is also not clear what happened to the $300,000 Thompson sent Holland & Knight for the TRO since the TRO in the Symphony Litigation was dissolved on December 20, 2018.

> **Response:** Denies the allegations in paragraph 109.

110.    **Allegation:** Even the $150,000 in finders' fees which Thompson withheld in the TRO are apparently missing.

> **Response:** Denies the allegations in paragraph 110.

111.    **Allegation**: Indeed, the Morgan Stanley Interrogatories demonstrate that Thompson, either alone or with the other Defendants, siphoned approximately $670,000 from Volantis account

following October 12, 2018 leaving it with about $30.[10]

> **Response:** To the extent the allegations of paragraph 11 seek to paraphrase or characterize the contents of written documents, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with the documents.

112.   **Allegation:** The deposition testimony in the Symphony Litigation of both Thompson and Nolan also demonstrate that scant records were kept in connection with Volantis' and FTL's corporate transactions.

> **Response:** Denies the allegations in paragraph 112.

113.   **Allegation:** With respect to the Separate Series Agreement, Thompson testified that he has "no idea" when it was signed. *See* Thompson Oct. 24, 2018 Dep. Tr. 265:24-266:1-10 (**Document 43-3**).

> **Response:** To the extent the allegations of paragraph 113 seek to paraphrase or characterize the contents of a written document or transcript, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with those documents.

114.   **Allegation:** Additionally, Thompson testified that he "***shredded***" the original ink signatures to the Separate Series Agreement. *Id.* at 268:21-23.  Thompson also testified that he has "***no idea***" whether any corporate resolutions were enacted by FTL in connection with the creation of Volantis. *Id.* at 295:2-6 (emphasis added).

> **Response:** To the extent the allegations of paragraph 114 seek to paraphrase or characterize the contents of a written document or transcript, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with those documents.

115.   **Allegation:** Nolan, FTL's Secretary testified at his deposition that Volantis was an entity he, Thomson, Ratner "had been using for the Bitcoin escrow services." *See* Oct. 26, 2018 Nolan Dep. Tr. 5:9-16 (**Document 47-3**).

> **Response:** To the extent the allegations of paragraph 115 seek to paraphrase or characterize the contents of written documents or transcripts, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with those documents.

---

[10] Nolan testified that he had "no authority" over "any" of the bank accounts of Volantis.

116.     **Allegation:** Shockingly, Nolan testified that although he personally drafted the escrow agreement at issue in the Symphony Litigation, he did not understand certain provisions he included in that agreement which he "picked . . . up from the trading people." *Id.* at 20:9-22. Specifically, Nolan declared: "I can tell you I don't understand what that means." *Id.*

> **Response:** To the extent the allegations of paragraph 116 seek to paraphrase or characterize the contents of written documents or transcripts, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with those documents.

117.     **Allegation:** Additionally, Nolan testified that he: (a) has never reviewed bank statements from FTL/Volantis's bank and he does not know whether anyone else besides Thompson reviews them (*id.* 39:9-15); (b) does not know whether Volantis is a DBA (*id.* at 40:24-41:1); (c) "thinks" he is also Secretary of Volantis and "responsible for maintaining corporate minutes" but does "not know" whether he is FTL's Secretary despite indicating such a title in the FTL LLC Agreement (*id.*); and (d) does not think any corporate minutes exist for Volantis or FTL, including corporate resolutions for opening bank accounts (*id.* at 42:2-9, 19-25 and 43: 1-3).

> **Response:** To the extent the allegations of paragraph 117 seek to paraphrase or characterize the contents of written documents or transcripts, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with those documents.

118.     **Allegation:** Incredibly, Nolan testified that he has no recollection of signing the Separate Series Agreement and would sign a document without having reviewed the body of the document "if it came from Barry [Thompson]" (*id.* at 44:25-45:1-4, 16-24; 46:13-15).

> **Response:** To the extent the allegations of paragraph 118 seek to paraphrase or characterize the contents of a written document or transcript, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with those documents.

119.     **Allegation:** Nor, does he recall signing the Separate Series Agreement. *Id.* at 49:24-25 – 50:1-14; 51:1-21. Additionally, Nolan testified regarding another two FTL members that were his companies – "Aymerich , LLC is a holding company I have with my wife that encompasses her fashion business and my consulting business" and "Xnumia, LLC is an LLC that I formed some years ago that

was to finance a Cryptocurrency vending business [which] encountered issues and we made the decision that we would give them shares of Volantis going forward." *Id.* at 46:24- 25-47:1-7.[11]

> **Response:** To the extent the allegations of paragraph 119 seek to paraphrase or characterize the contents of a written document or transcript, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with those documents.

120.   **Allegation:** Mr. Nolan's casual approach to his selective memory was summed up in one statement he made at his deposition – "What I don't recollect is amazing. Ask my wife." *Id.* at 52:21-22.

> **Response:** To the extent the allegations of paragraph 120 seek to paraphrase or characterize the contents of a written document or transcript, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with those documents.

121.   **Allegation:** Unsurprisingly, he could not recollect any discussions "with anyone at Volantis with regard to the formation of Volantis Escrow Platform, LLC" as a separate series. *Id.* at 52:23-25-53:1-3.

> **Response:** To the extent the allegations of paragraph 121 seek to paraphrase or characterize the contents of a written document or transcript, the document or transcripts speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with those documents.

122.   **Allegation:** Moreover, he did not know whether FTL's certificate of formation needed to be amended to create Volantis. *Id.* at 53:18-25 – 54:1-3.

> **Response:** To the extent the allegations of paragraph 122 seek to paraphrase or characterize the contents of a written document or transcript, the document or transcripts speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with those documents.

123.   **Allegation:** Laughingly, according to Nolan, the company's "Secretary," if Thompson (the managing director of FTL with 95% interest therein) had discussed Volantis' formation with him

---

[11] With respect to Dan Morran, the director of FTL whose signature on the Separate Series Agreement was blank, according to Nolan, he was a "gentleman that helped raise money from the Xnumia, LLC and had no involvement in Volantis. *See* Oct. 26, 2018 Nolan Dep. Tr. 47:8-16.  According to Nolan, Morran "was one of the parties in the failed Xnumia situation and we wished to compensate him going forward." *Id.* 47:17-21. Furthermore, Mr. Morran was given equity in Volantis for his past services which he still held as of October 2018. *Id.* at 47:25-48:8.

"it went in one ear and out the other. I just don't recollect it at all." *Id.* at 54:7-9.

> **Response:** To the extent the allegations of paragraph 123 seek to paraphrase or characterize the contents of a written document or transcript, the document or transcripts speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with those documents.

124.   **Allegation:** Finally, Plaintiff's counsel in the Symphony Litigation pointed out that

***even FTL*** was not in good standing with the State of Delaware as of July 18, 2018. Nolan Dep. Tr.

19:25- 20:1-4.

> **Response:** To the extent the allegations of paragraph 124 seek to paraphrase or characterize the contents of a written document or transcript, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with those documents.

### IV.   The Criminal Action

125.   **Allegation:** On July 25, 2019, Thompson was arrested in Easton, Pennsylvania and

charged with a fraudulent scheme involving over $7 million.

> **Response:** Denies the allegations in paragraph 125 except admits that Thompson was arrested in Easton, Pennsylvania on July 25, 2019.

126.   **Allegation:** According to the complaint in the Criminal Action (Case 1:19-cr-00698-ER)

and the press release from the United States Justice Department,[12] Thompson, as the principal of the

cryptocurrency escrow company Volantis and a "related company Volantis Market Making LCC," was

charged with two counts of commodities fraud, each of which carries a maximum sentence of 10 years

in prison, and two counts of wire fraud, each of which carries a maximum sentence of 20 years in prison,

for taking over $7 million from two victim companies (Symphony being one of such companies) after

making false representations in connection with Bitcoin transactions.

> **Response:** To the extent the allegations of paragraph 126 seek to paraphrase or characterize the contents of written documents, the documents speak for themselves and Thompson denies the allegations to the extent that they are inconsistent with the documents.

---

[12] https://www.justice.gov/usao-sdny/pr/principal-cryptocurrency-escrow-company-charged-manhattan-federal- court-fraudulent

127.   **Allegation:** According to the U.S. Attorneys' Office, Thompson induced investors to engage in cryptocurrency transactions "by touting a transaction structure that would eliminate any risk of loss during the purchase.  As his clients soon realized, however, Thompson's representations were false, and these cryptocurrency investors ultimately lost all of the money they had entrusted with him because of his lies . . . . Thompson allegedly thought no one would ask where their actual money went when they trusted him to invest in Bitcoin." *Id.*

> **Response:** To the extent the allegations of paragraph 127 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

128.   **Allegation:** The Criminal Action alleges that in June and July 2018, Thompson made false statements to one victim company -- "Company-1"-- (presumably, Symphony) to induce Company-1 to send Volantis over $3 million to fund the purchase of Bitcoin for Company-1. Thomson "lied for days about the status of the transaction and the location of Company-1's Bitcoin and money, which was never returned."[13]

> **Response:** To the extent the allegations of paragraph 128 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

129.   **Allegation:** Additionally, in July 2018, Thompson "made false statements to another victim company ("Company-2") to induce Company-2 to send Volantis over $4 million to fund the purchase of Bitcoin for Company-2   Thompson never provided Company-2 with any Bitcoin, nor did he return Company-2's money.  After receiving Company-2's money, Thompson also lied to Company-2 about the location of the Bitcoin and the status of the transaction." *Id.*

> **Response:** To the extent the allegations of paragraph 129 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

---

[13] https://www.justice.gov/usao-sdny/pr/principal-cryptocurrency-escrow-company-indicted-7-million-fraudulent- scheme

130.     **Allegation:** On September 30, 2019, the grand jury in the Southern District of New York returned an indictment charging Thompson with the commodities fraud and wire fraud offenses.

**Response:** Denies the allegations in paragraph 130, except admits that the grand jury in the Southern District of New York returned an indictment charging Thompson on September 27, 2019, and refers the Court to the document for its full and complete contents.

131.     **Allegation:** The Criminal Actions [*sic*] complaint specifically cites the NYC Bank Account:

> On or about June 28, 2018, Company-1 wired $650,000 to a ***Morgan Stanley bank account used by Volantis Escrow (the "Morgan Stanley Account")*** in order to fund the purchase of 100 Bitcoin. The Morgan Stanley Account is held in the name of ***FTL Holding, LLC***, which is another company associated with THOMPSON. Based on my review of the account records, I know that ***THOMPSON was the only authorized signatory on the account***.

**Document 1** ¶ 13(s) (emphasis added).

> On or about July 1, 2018, THOMPSON emailed the Company-1 Trader and attached ***a fraudulent "Portfolio Status Report" for the Morgan Stanley Account***. . .

*Id.* at ¶ 13(x) (emphasis added).

> ***The Morgan Stanley records show that the Morgan Stanley Account was not used by THOMPSON solely for Company-1's funds; rather it contained multiple other deposits and transfers/withdrawals***, including transfers out of the account on June 28 and 29, 2018 in the amounts of $117,000, $30,000, and $20,000. In particular, on June 29, 2018, after receiving Company-1's money, THOMPSON transferred $20,000 to another account controlled by THOMPSON.

*Id.* at p. 15 n. 4 (emphasis added).

> Based on THOMPSON's fraudulent representation that the Volantis Entities had the Bitcoin in hand and his fraudulent representation that he would keep custody of Company-1's cash until there was an "atomic swap" of cash and Bitcoin, on or about July 3, 2018, at approximately 9:28 am, ***Company-1 wired an additional $2.6 million into the Morgan Stanley Account (bringing the total in the Morgan Stanley Account from Company-1 to $3.25 million)***.

*Id.* at ¶ 13(cc) (emphasis added).

> The Volantis Entities did not send the 500 Bitcoin to Company-1's wallet on July 3, 2018. ***Nor did the Volantis Entities maintain Company-1's cash in the Morgan***

***Stanley Account***. Rather, on or about July 3, 2018, the same day Company-1 had sent the Volantis Entities $2.6 million, the ***Volantis Entities wired approximately $3,090,250 from the Volantis Entities' Morgan Stanley Account to a bank account held by a law firm in Florida***. Also, on July 3, 2018, the Volantis Entities transferred approximately $100,000 to ***another Morgan Stanley account in the name of FTL Holding, LLC (the "Second Morgan Stanley Account")***. The $100,000 transferred to the Second Morgan Stanley Account was then wired to the bank account of a separate company with which THOMPSON appeared to have a financial relationship.

*Id.* at ¶ 13(gg) (emphasis added).

Between on or about June 28, 2018, when Company-1 had sent the Volantis Entities approximately $650,000 and July 3, 2018, ***the Morgan Stanley Account received deposits from other entities***.

*Id.* at p. 18 n. 5 (emphasis added).

The $3.25 million that Company-1 sent to the Morgan Stanley Account in total was never returned to Company-1, nor did Company-1 ever receive the 500 Bitcoin it attempted to purchase.

*Id.* at ¶ 13(pp).

On or about July 24, 2018, THOMPSON and Seller-2 entered into a contract for Volantis Escrow to purchase Bitcoin from Seller-2 (the "Sales Contract"). . . . The Sales Contract provided that all payments from Volantis Escrow for the Bitcoin were to be paid out of ***its Morgan Stanley Account in New York, New York***.

*Id.* at ¶ 14(k) (emphasis added).

Based on Thompson's representations, including his telling the Company-2 CEO that he already had the Bitcoin in his possession, on or about July 24, 2018, Company-2 executed the block purchase order and wired approximately €3.6 million to Volantis Escrow. ***The €3.6 million was wired from a bank in Europe to the Morgan Stanley Account in New York*** and was received on or about July 25, 2018.

*Id.* at ¶ 14(o) (emphasis added).

On or about July 27, 2018, three days after receiving Company-2's funds, without receiving any Bitcoin from the Third-Party Escrow or Seller-2, and despite the red flags identified by THOMPSON regarding the Third-Party Escrow, ***the Volantis Entities wired approximately $4,024,914.56 from the Morgan Stanley Account to an account held by the Third-Party Escrow***.

*Id.* at ¶ 14(t) (emphasis added).

[O]n or about August 8, 2018, THOMPSON converted the remaining €100,000 of

34

Company-2's money to U.S. dollars (worth $115,620.80) and then transferred $100,000 to THOMPSON'S *Second Morgan Stanley Account*. Just as he had done with Company-1's money, THOMPSON then wired the $100,000 to the same separate company with which THOMPSON appeared to have a financial relationship.

*Id.* at ¶ 14(u) (emphasis added).

> **Response:** To the extent the allegations of paragraph 131 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

132.    **Allegation:** On October 1, 2020, Thompson pled guilty to Count I in the Criminal Action, which provides:

COUNT ONE
(Commodities Fraud)

From in or about June 2018 through in or about July 2018, in the Southern District of New York and elsewhere, JON BARRY THOMPSON, a/k/a "J. Barry Thompson," the defendant, as principal of Volantis Escrow Platform LLC ("Volantis Escrow"), willfully and knowingly, used and employed, and attempted to use and employ, in connection with a contract of sale of a commodity in interstate commerce, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, any manipulative device, scheme, and artifices to defraud; (2) making, and attempting to make, any untrue or misleading statement of a material fact and omitting to state a material fact necessary in order to make the statements made not untrue or misleading; and (c) engaging, or attempting to engage in any act, practice, and course of business which operates and would operate as a fraud and deceit upon any person, to wit, THOMPSON made false statements to representatives of a company ("Company-1") in order to induce Company-1 to wire millions of dollars to Volantis Escrow in connection with the sale of Bitcoin.

(Title 7, United States Code, Sections 9(1) and 13(a) (5); Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

See **Document 1** ¶ 1.

> **Response:** Thompson admits that he pled guilty to Count One of 19-CR-698 (S.D.N.Y.). To the extent the allegations of paragraph 132 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

**V.**                                                      **The CFTC Action**

133.    **Allegation:** On September 30, 2019, the CFTC filed its action against Thompson (Case 1:19-cv-09052-LAP) for violations of the Commodity Exchange Act, 7 U.S.C. §§ 1–26 (2012), and Commission Regulations, 17 C.F.R. pt. 1–190 (2019).

> **Response:** Denies the allegations in paragraph 133, except admits that the CFTC filed an action with Case No. 1:19-cv-09052-LAP, against Thompson on September 30, 2019, and refers the Court to the document for its full and complete contents.

134.    **Allegation:** The CFTC Action is based on the same facts as the Criminal Action, and alleges:

> During the period from at least in or around June 2018 through at least August 2018 (the "Relevant Period"), Jon Barry Thompson ("Thompson") employed a deceptive and fraudulent scheme by knowingly or recklessly making false representations to customers (generally "Customers") in connection with the purported purchase of virtual currency, specifically Bitcoin, worth millions of dollars. Contrary to Thompson's false representations, neither he nor a company with which he was affiliated (the "Escrow Company") had possession or control of the Bitcoin that was to be delivered to the Customers. Bitcoin was never delivered to the Customers and Customer funds were not safeguarded as promised. Instead, Thompson transferred Customer funds to accounts for the benefit of others, including to one or more accounts of at least one company affiliated with Thompson. In an effort to conceal from the Customers the fact that they had been defrauded, Thompson made additional false representations as to why he was unable to deliver the Bitcoin to them as promised.

**Document 1**, at ¶ 1.

> **Response:** To the extent the allegations of paragraph 134 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

135.    **Allegation:** Similar to the Criminal Action, the CFTC Action discusses Thompson's use of the NYC Bank Account further to the fraudulent scheme:

> On or about June 27, 2018, Thompson emailed the Customer-1 Trader a welcome package with wire instructions. The wire instructions directed that funds to be transmitted by US Fedwire should pass through *a specified bank in New York, for further credit to an account "c/o J. Barry Thompson" at the Escrow Financial Institution, also located in New York, New York (the "Escrow Bank Account"). Thompson was the only authorized signatory on the account.*

*Id.* at ¶ 28 (emphasis added).

> **Response:** To the extent the allegations of paragraph 135 seek to paraphrase or characterize the

contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

136.   **Allegation:** The allegations in the CFTC parallel those in the Criminal Action.   The CFTC Action was stayed on November 19, 2019 on consent of all parties following the U.S. Government's application to intervene.

**Response:** Denies the allegations in paragraph 136, except admits that the CFTC Action was stayed on November 19, 2019.

137.   **Allegation:** On October 1, 2020, the stay was lifted in light of the resolution of the Criminal Action, and the Consent Decree was so-ordered by the Court. *See* **Document 14**.

**Response:** Admits the allegations in paragraph 137.

138.   **Allegation:** The Consent Decree recites Findings of Fact and Conclusions of Law that largely parallel the complaints in the Criminal Action and CFTC Action, including Thompson's perpetuation of fraud on Customer 1 and Customer 2 through use of the NYC Bank Account. *Id.* ¶¶ 16-103.

**Response:** To the extent the allegations of paragraph 138 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

139.   **Allegation:** The Consent Decree further provides that Thompson "[c]onsents to the use of the findings and conclusions in this Consent Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, agrees that they shall be taken as true and correct and be given preclusive effect therein." *Id.* ¶ 12.

**Response:** To the extent the allegations of paragraph 139 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

140.   **Allegation:** It also provides that Thompson "[a]grees that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against him in any other proceeding." *Id.* ¶ 15[.]

**Response:** To the extent the allegations of paragraph 140 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the

allegations to the extent that they are inconsistent with that document.

141.   **Allegation:** In the Consent Decree, Thompson also consented to the entry of a permanent injunction enjoining him from, among other actions, trading or owning any commodities, whether for himself or on behalf of any person or entity, and working for any person or entity registered with the CFTC. *Id.* ¶ 105.

**Response:** To the extent the allegations of paragraph 141 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

142.   **Allegation:** The Consent Decree provides for restitution obligations, specifically for payment in the amount of $7,431,728.30 within ten days thereof. *Id.* ¶ 106.

**Response:** To the extent the allegations of paragraph 142 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

143.   **Allegation:** The Consent Order also provides:

The amounts payable to each customer shall not limit the ability of any customer from ***proving that a greater amount is owed from Defendant or any other person or entity***, and ***nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law***.

Pursuant to Rule 71 of the Federal Rules of Civil Procedure, ***each customer of Defendant who suffered a loss is explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendant*** to ensure continued compliance with any provision of this Consent Order and to hold Defendant in contempt for any violations of any provision of this Consent Order.

*Id.* at ¶¶ 114-115 (emphasis added).

The failure of any party to this Consent Order or of any customer at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or customer at a later time to enforce the same or any other provision of this Consent Order.

*Id.* at ¶ 122.

**Response:** To the extent the allegations of paragraph 143 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the

allegations to the extent that they are inconsistent with that document.

**VI.**                                      **Other Action from Defrauded Client**

144.    **Allegation:** In addition to the Symphony Litigation, the Criminal Action, the CFTC

Action, the Caleb and Brown Stayed Arbitration, the arbitration with Iterative OTC, LLC and the instant

action, Thompson and FTL (among other individuals and entities) were sued by yet another victim of a

"brazen scheme to defraud" in the Eastern District Court of Pennsylvania (Case 2:19-cv-05115-GAM,

the "**O'Shaughnessy Litigation**").

> **Response:** Denies the allegations in paragraph 144 except admits that Thompson was named as a defendant in a lawsuit in the Eastern District of Pennsylvania with docket number 2:19-cv-05115-GAM.

145.    **Allegation:** The complaint in the O'Shaughnessy Litigation alleges that defendants

"induced O'Shaughnessy to invest in a non-existent and entirely fraudulent high-yield investment

program, and to enrich themselves with their ill-gotten gains." **Document 9**, at ¶1.

> **Response:** To the extent the allegations of paragraph 145 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

146.    **Allegation:** The complaint further alleges that:

> Defendants promoted the scheme by fraudulently representing that they were able to access a non-existent trading program which they claimed would be administered by a major European financial institution in order to fund "humanitarian" projects, and which promised extraordinary rates of return at *little or no risk* to O'Shaughnessy. Defendants further fraudulently represented that O'Shaughnessy's *money would be held in trust throughout the duration of the purported trades, and would not be placed at risk as part of the supposed trades*. In truth and in fact, however, Defendants did not use O'Shaughnessy's money to participate in any such investment program, nor were O'Shaughnessy's funds held in trust as promised. Instead, *Defendants transferred O'Shaughnessy's money to other accounts for their own illicit benefit, including to accounts controlled by* [another defendant,] *Thompson, and their associates*.

*Id.* (emphasis added).

> Defendants further engaged in a concerted effort to conceal the fact that they had defrauded O'Shaughnessy, and to facilitate further efforts to defraud O'Shaughnessy by *attempting to induce O'Shaughnessy to transfer additional funds to Defendants*. Specifically, Defendants and their co-conspirators made numerous additional false

representations to O'Shaughnessy **assuring him that his investment would be returned to him when, in fact, that money had been dissipated and converted to the use of Defendants and their co-conspirators**.

*Id.* at ¶2 (emphasis added).

> During the course of the scheme, Defendants successfully defrauded O'Shaughnessy of $1 million, and unsuccessfully attempted to defraud O'Shaughnessy of a further $2.1 million.

*Id.* at ¶3.

> **Response:** To the extent the allegations of paragraph 146 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

147.    **Allegation:** The O'Shaughnessy Litigation alleges that Thompson, FTL, and another

Delaware LLC controlled by Thompson from the same office in Bethlehem, Pennsylvania, Citrof LLC

("**Citrof**") perpetuated the following fraudulent scheme:

> Thompson, Citrof and FTL Holding retained [William C. Cumbie, Esq., -- **an attorney residing in Jacksonville, Florida**],[14] and secured, through Cumbie, the ability to use Cumbie's trust account ending 4337 (the "Cumbie Account") **at JPMorgan Chase in New York, New York**. Thompson, Citrof, and FTL Holding divided the proceeds of the fraudulent scheme among the Defendants, and **issued instructions to Cumbie to effectuate the division and dissipation of the proceeds of the fraudulent scheme**.
> Thomson, Citrof, and FTL Holding performed this role in exchange for a share of the proceeds of the scheme.

*Id.* at ¶33(a) (emphasis added).

> **Response:** To the extent the allegations of paragraph 147 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

148.    **Allegation:** O'Shaughnessy complaint also alleges that a portion of the funds embezzled

from him went to FTL's bank account in New York, New York. Specifically, that "[o]n or about July 5,

2019,[15] at Thompson's direction, and based on the purported authority of the Closing Instruction and

---

[14] Presumably, Mr. Cumbie's escrow account is the bank account held by a law firm in Florida referenced in the Criminal Action.

[15] Thompson was arrested 20 days later.

several payment instructions prepared by Thompson [and others], Cumbie caused several distributions to be made from the Cumbie Account, which held O'Shaughnessy's $1 million, including . . . [a] ***wire in the amount of $10,000 to FTL Holding, LLC's account at JPMorgan Chase in New York, New York***.[16] *Id.* at ¶64(c) (emphasis added).

> **Response:** To the extent the allegations of paragraph 148 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

149.   **Allegation**: The O'Shaughnessy Litigation alleges the following claims against Thompson, FTL and other defendants:

- Fraud - Violation of Exchange Act Section 10(b) and Rule 10b-5
- Offer and Sale of Unregistered Securities - Securities Act Sections 5(a), 5(c) and 12(a)(1)
- Common Law Fraud
- Conspiracy to Defraud
- Aiding and Abetting Fraud
- Negligent Misrepresentation
- Conversion
- Conspiracy to Commit Conversion
- Aiding and Abetting Conversion
- Unjust Enrichment

> **Response:** To the extent the allegations of paragraph 149 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies the allegations to the extent that they are inconsistent with that document.

150.   **Allegation:** The O'Shaughnessy Litigation is currently pending although a default was entered against Thompson, FTL and Citrof in March of 2020 for failing to answer the complaint.

> **Response:** Admits the allegations in paragraph 150.

## CLAIMS

### COUNT I – RICO Violations, 18 U.S.C. §1964(c)
(Against all Defendants)

---

[16] Contrarily, Thompson repeatedly represented to the Jams arbitrator in the Stayed Arbitration with Caleb and Brown that he and Volantis were insolvent and could not afford to pay the arbitration fees billed to them, necessitating Caleb and Brown to cover those fees to proceed with the arbitration.

151.   **Allegation:** The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

**Response:** Thompson repeats and realleges the contents of the above paragraphs of the Answer as if set forth fully herein.

152.   **Allegation:** The association of Defendants and potentially others, whose identities are currently unknown to Plaintiff (cumulatively, the "**Conspirators**"), constituted an Enterprise within the meaning of 18 U.S.C. §1961(4), which Enterprise was engaged in, and whose activities affected, interstate and foreign commerce. This Enterprise was continuous in that it lasted for at least three (3) years, had an ascertainable structure, and was distinct from the predicate offenses alleged herein.

**Response:** Paragraph 152 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 152.

153.   **Allegation:** Each Defendant is a person within the meaning of 18 U.S.C.§1961(3) and separate from the Enterprise.

**Response:** Paragraph 153 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 153.

154.   Defendant, Thompson purports to be Volantis' "Managing Director" and "Managing Member" -- holding 95% of Volantis' ownership interest and 90% of its voting rights.  Thompson also purports to be a "Company Member" and "Managing Director" of FTL.  According to public profiles of Thompson, he is a "Founding Partner" of FTL. According to Thompson's email signature footer, he is the "MD, Volantis Escrow Platform and Global Affiliates."

**Response:** Denies the allegations in paragraph 154, except admits that Thompson is a Company Member and Managing Director of FTL.

155.   **Allegation:** According to Nolan's LinkedIn profile, he is and has been a "Partner at FTL" since January 2013. Additionally, according to Thompson, Nolan is a "Company Member" and "Secretary" of FTL.  According to Thompson, Nolan is also an "Officer" of Volantis. Thompson also

purports that Aymerich, LLC  is a "Shareholder" of Volantis -- a holding company belonging to Nolan and his wife.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 155, except admits that Nolan is a Company Member and Secretary of FTL and an Officer of Volantis, and that Aymerich, LLC is a Shareholder of Volantis.

156.  **Allegation:** Thompson purports Ratner to be a "Series Member" and "Officer" of Volantis and "FTL Director."  Thompson also purports that Ratner is a "Shareholder" holding 50% of the voting units of Volantis.

**Response:** Denies the allegations in paragraph 156, except admits that Ratner is a Shareholder of Volantis.

157.  **Allegation:** Upon information and belief, Thompson, together with Nolan and Ratner, were the orchestrators of the Enterprise who set up, orchestrated, and supervised the entire racketeering scheme at issue. While they, and the other Conspirators, acted through various corporate entities, they functioned in the same ostensible business and with the same *modus operandi*.

**Response:** Denies the allegations in paragraph 157.

158.  **Allegation:** The Corporate Defendants are either actual or fabricated corporate entities, through which the Enterprise functioned, and through which the underlying racketeering scheme was carried out.

**Response:** Denies the allegations in paragraph 158.

159.  **Allegation:** Defendants' *scienter* is established from their pattern and practices at issue and the centrality of these practices to their entire business.

**Response:** Paragraph 159 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 159.

160.  **Allegation:** Defendants' *scienter* may also be inferred from the Criminal Action, the CFTC Action, the Symphony Litigation, and the "O'Shaughnessy Litigation, which actions are still pending as of today.

**Response:** Paragraph 160 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 160.

161.    **Allegation:** Upon information and belief, Defendants and Conspirators, acting in concert and agreement, formulated the Enterprise with the intention to engage in fraudulent activities described above and specifically to engage in RICO predicate acts of commodities and mail and wire frauds.

**Response:** Denies the allegations in paragraph 161.

162.    **Allegation:** Upon information and belief, Defendants have continued their lucrative racketeering Enterprise because they continue to reap vast profits therefrom.

**Response:** Denies the allegations in paragraph 162.

163.    **Allegation:** Upon information and belief, Defendants participated, and conspired with others (whose identities are known only to Defendants at this time) to participate, in the affairs of the aforementioned Enterprise through a pattern of racketeering activity, as more fully set forth herein, all in violation of 18 U.S.C. §1962(c).

**Response:** Denies the allegations in paragraph 163.

164.    **Allegation:** In furtherance of the Enterprise, Defendants and Conspirators engaged in the following predicate acts in violation of 18 U.S.C. §1962(c):

Commodities Fraud Violations (Section 6(c)(1) of the Commodities Exchange Act (the "**Act**"), 7 U.S.C. § 9(1) (2012) and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019))

**Response:** Paragraph 164 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 164.

165.    **Allegation:** As described above and in the CFTC Action and Criminal Action, Defendants and other Conspirators violated Section 6(c)(1) of the Act and Regulation 180.1(a) by, among other things, in connection with contracts of sale of commodities in interstate commerce, using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud, making or attempting to make untrue or misleading statements of material fact or omitting to state or attempting to omit material facts necessary in order to make statements made not untrue or misleading,

and engaging or attempting to engage in a course of business operating as a fraud or deceit upon Plaintiff and multiple other victims of their fraud.

<u>Mail Fraud, Violations (Title 7, United States Code, Sections 9(1) and 13(a) (5); Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2)</u>

**Response:** Paragraph 165 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 165.

166.   **Allegation:** As described above and in the Criminal Action, Defendants and the other Conspirators of the Enterprise, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, Defendants, through interstate emails and financial transfers, carried out a scheme to Plaintiff and other victims of fraud to wire millions of dollars to Defendants and Conspirators by making false statements to representatives of Plaintiff and other victims with respect to a Bitcoin transaction.

**Response:** Paragraph 166 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 166.

167.   **Allegation:** Additionally, upon information and belief, Defendants received income derived, directly or indirectly, from a pattern of racketeering activity in which Defendants participated as principals (the "**<u>Illicit Income</u>**").

**Response:** Denies the allegations in paragraph 167.

168.   **Allegation:** Moreover, upon information and belief, in violation of 18 U.S.C. § 1962(a), Defendants used or invested, directly or indirectly, such Illicit Income, or the proceeds of such Illicit Income, in acquisition of an interest in, or the establishment or operation of, enterprises which are engaged in, or the activities of which affect, interstate or foreign commerce.

**Response:** Paragraph 168 asserts legal conclusions to which no response is required. To the

extent a response is required, Thompson denies the allegations in paragraph 168.

169.   **Allegation:** Upon information and belief, Thompson invested, directly or indirectly, his Illicit Income, or the proceeds of his Illicit Income, in at least one of the following enterprises: FTL, Volantis, Volantis Market, Citrof, Xnumia, LLC, Aymerich, LLC, FTL Holding Carbon Trading LLC, FTL Holding Series 6 LLC, FTL Holding Investments LLC, JLC2019 Network, Inc., f/k/a/ SSPT Network, Inc., Dagda Partners, LLC, Prodea Systems, Inc., The Fresnel Companies, HeroX, Tervela Inc., XPRIZE Foundation, and SlaveFree Partners, LLC.

**Response:** Denies the allegations in paragraph 169.

170.   **Allegation:** Upon information and belief, Nolan invested, directly or indirectly, his Illicit Income, or the proceeds of his Illicit Income, in at least one of the following enterprises: FTL, Volantis, Volantis Market, Xnumia, LLC, Aymerich, LLC, FTL Holding Carbon Trading LLC, FTL Holding Series 6 LLC, FTL Holding Investments LLC, Dagda Partners, LLC, SlaveFree Partners, LLC, and Life Community Homes Ltd.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 170.

171.   **Allegation:** Upon information and belief, Ratner invested, directly or indirectly, his Illicit Income, or the proceeds of his Illicit Income, in at least one of the following enterprises: FTL, Volantis, Volantis Market, Xnumia, LLC, Aymerich, LLC, FTL Holding Carbon Trading LLC, FTL Holding Series 6 LLC, FTL Holding Investments LLC, TrigonX, and OTCXN, Inc.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 171.

172.   **Allegation:** Additionally, Defendants, in violation of 18 U.S.C. § 1962(b), through a pattern of racketeering activity acquired or maintained, directly or indirectly, interest in or control of enterprises which is engaged in, or the activities of which affect, interstate or foreign commerce.

**Response:** Paragraph 172 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 172.

173.    **Allegation:** Upon information and belief, Thompson acquired or maintained, directly or indirectly, interest in or control of at least one of the following enterprises through a pattern of racketeering activity: FTL, Volantis, Volantis Market, Citrof, Xnumia, LLC, Aymerich, LLC, FTL Holding Carbon Trading LLC, FTL Holding Series 6 LLC, FTL Holding Investments LLC, JLC2019 Network, Inc., f/k/a SSPT Network, Inc., Dagda Partners, LLC, Prodea Systems, Inc., The Fresnel Companies, HeroX, Tervela Inc., XPRIZE Foundation, and SlaveFree Partners, LLC.

**Response:** Denies the allegations in paragraph 173.

174.    **Allegation:** Upon information and belief, Nolan acquired or maintained, directly or indirectly, interest in or control of at least one of the following enterprises through a pattern of racketeering activity: FTL, Volantis, Volantis Market, Xnumia, LLC, Aymerich, LLC, FTL Holding Carbon Trading LLC, FTL Holding Series 6 LLC, FTL Holding Investments LLC, Dagda Partners, LLC, SlaveFree Partners, LLC, and Life Community Homes Ltd.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 174.

175.    **Allegation:** Upon information and belief, Ratner acquired or maintained, directly or indirectly, interest in or control of at least one of the following enterprises through a pattern of racketeering activity: FTL, Volantis, Volantis Market, Xnumia, LLC, Aymerich, LLC, FTL Holding Carbon Trading LLC, FTL Holding Series 6 LLC, FTL Holding Investments LLC, TrigonX, and OTCXN, Inc.

**Response:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 175.

176.    **Allegation:** Through its racketeering activities, Defendants deprived Plaintiff of $400,000.00 of its funds plus interest, as well as costs and fees incurred in attempting to collect its funds.

**Response:** Denies the allegations in paragraph 176.

177.    **Allegation:** Plaintiff also experienced lost trading revenues, diminished business due to

capital depletion, lost business revenue, and other damages, along with significant legal fees and expenses, in an amount presently unknown but believed to be in excess of $900,000.00.

**Response:** Denies the allegations in paragraph 177.

178.   **Allegation:** Plaintiff seeks recovery of treble damages it has sustained, as well as all costs and attorneys' fees it sustained, in an amount to be determined at trial pursuant to 18 U.S.C. § 1964(c).

**Response:** Admits that Plaintiff purports to seek recovery of treble damages.

**COUNT II – Conspiracy to Commit RICO Violations 18 U.S.C. §1962(d)**
(Against all Defendants)

179.   **Allegation:** The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

**Response:** Thompson repeats and realleges the contents of the above paragraphs of the Answer as if set forth fully herein.

180.   **Allegation:** Defendants knowingly conspired to form the corrupt Enterprise described above.

**Response:** Denies the allegations in paragraph 180.

181.   **Allegation:** Each Defendant was aware of the purpose of the group's conspiracy, namely to defraud Plaintiff and the other victims of fraud.

**Response:** Denies the allegations in paragraph 181.

182.   **Allegation:** Each Defendant committed acts in furtherance of the conspiracy, as described above.

**Response:** Denies the allegations in paragraph 182.

183.   **Allegation:** Through its racketeering activities, Defendants deprived Plaintiff of $400,000.00 of its funds plus interest, as well as costs and fees incurred in attempting to collect its funds.

**Response:** Denies the allegations in paragraph 183.

184.   **Allegation:** Plaintiff also experienced lost trading revenues, diminished business due to

capital depletion, lost business revenue, and other damages, along with significant legal fees and expenses, in an amount presently unknown but believed to be in excess of $900,000.00.

**Response:** Denies the allegations in paragraph 184.

185.    **Allegation:** Plaintiff seeks recovery of treble damages it has sustained, as well as all costs and attorneys' fees it sustained, in an amount to be determined at trial pursuant to 18 U.S.C. § 1964(c).

**Response:** Admits that Plaintiff purports to seek recovery of treble damages.

**COUNT III – Breach of Contract**
(Against Thompson as Alter Ego of Volantis)

186.    **Allegation:** The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

**Response:** Thompson repeats and realleges the contents of the above paragraphs of the Answer as if set forth fully herein.

187.    **Allegation:** The Escrow Agreement constitutes a valid and legally binding obligation of Thompson under the guise of Volantis, enforceable against Thompson in accordance with its terms.

**Response:** Paragraph 187 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 187.

188.    **Allegation:** Caleb and Brown fully complied with the terms of the Escrow Agreement by making four (4) wires totaling approximately $1.46 million to Volantis and Thompson in preparation of a trade of fiat currency for cryptocurrency.

**Response:** Paragraph 188 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 188.

189.    **Allegation:** Thompson and Volantis breached the Escrow Agreement by failing to maintain Plaintiff's funds secure in an individual escrow account pursuant to the requirements of the Escrow Agreement, bundling Plaintiff's funds with other funds to purchase a bigger block of coin or otherwise, failing to obtain and maintain the insurance policy required in the Escrow Agreement to minimize risk to Plaintiff, diverting Plaintiff's funds to entities in which Thompson or others had a

personal interest, using Plaintiff's funds for Thompson's own personal purposes, and failing to return

$400,000 in Caleb and Brown's funds despite numerous demands.

**Response:** Paragraph 189 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 189.

190.   **Allegation:** As a direct result of Thompson's failure to refund Caleb and Brown's funds,

Plaintiff has been deprived of $400,000 of its funds plus interest, as well as costs and fees incurred in

attempting to collect its funds.[17]

**Response:** Paragraph 190 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 190.

191.   **Allegation:** Plaintiff also experienced lost trading revenues, diminished business due to

capital depletion, lost business revenue, and other damages, along with significant legal fees and

expenses, in an amount presently unknown but believed to be in excess of $900,000.00.

**Response:** Denies the allegations in paragraph 191.

192.   **Allegation:** Plaintiff seeks recovery of those funds for Thompson's and Volantis'

breaches of contract.

**Response:** Denies the allegations in paragraph 192.

### COUNT IV – Conversion
(Against all Defendants)

193.   **Allegation:** The contents of the above paragraphs are incorporated herein by reference

as if fully set forth herein.

**Response:** Thompson repeats and realleges the contents of the above paragraphs of the Answer as if set forth fully herein.

194.   **Allegation:** As further detailed herein, Defendants converted $400,000.00 of Plaintiff's

funds.

**Response:** Paragraph 194 asserts legal conclusions to which no response is required. To the

---

[17] Thompson and Volantis also breached the Escrow Agreement by refusing to pay their share of the arbitration fees in the Stayed Arbitration, which Plaintiff paid.

extent a response is required, Thompson denies the allegations in paragraph 194.

195.    **Allegation:** By using Plaintiff's escrowed funds, either for personal purposes or as part of another transaction, investment, or coin purchase, without consent and without lawful justification, Defendants deprived Plaintiff of its right of use and possession of its property.

**Response:** Paragraph 195 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 195.

196.    **Allegation:** As a direct result of Defendants' conversion, Plaintiff also experienced lost trading revenues, diminished business due to capital depletion, lost business revenue, and other damages, along with significant legal fees and expenses.

**Response:** Denies the allegations in paragraph 196.

197.    **Allegation:** As a direct and proximate cause of Defendants' conversion, Plaintiff has been injured in the amount currently in excess of $900,000 plus interest.

**Response:** Denies the allegations in paragraph 197.

198.    **Allegation:** Plaintiff seeks recovery of those funds for Defendants' conversion.

**Response:** Denies the allegations in paragraph 198.

### COUNT V – Fraud in Inducement
(Against Thompson)

199.    **Allegation:** The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

**Response:** Thompson repeats and realleges the contents of the above paragraphs of the Answer as if set forth fully herein.

200.    **Allegation:** As further detailed above, prior to entry into the Escrow Agreement, Thompson made knowingly false misrepresentations regarding the safety and reliability of working with Volantis for purchase and sale of cryptocurrencies in order to induce Caleb and Brown to wire funds to Volantis which Thompson intended to unauthorizedly use.

**Response:** Denies the allegations in paragraph 200.

51

201.    **Allegation:** In fact, although the Escrow Agreement contains a warranty that the "Company maintains general business insurance with liability coverage up to Fifty Million Dollars ($50,000,000.00)" (*see* **Exhibit A** §4(h)), upon information and belief, Thompson and Volantis did not obtain such insurance and had no intention of doing so.

> **Response:** Denies the allegations in paragraph 201, and to the extent the allegations of paragraph 201 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Thompson denies any allegations that are inconsistent with that document.

202.    **Allegation:** Thompson led the negotiations with Caleb and Brown, fraudulently induced Plaintiff to enter into the Escrow Services Agreement, and was responsible for the conversion of Caleb and Brown's funds.

> **Response:** Paragraph 202 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 202.

203.    **Allegation:** Thompson used his domination of Volantis to fraudulently induce Caleb & Brown to enter into the Escrow Services Agreement and to convert Calen & Brown's funds all the meanwhile attempting to shield himself from personal liability.

> **Response:** Paragraph 203 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 203.

204.    **Allegation:** Plaintiff relied in good faith on Thompson's representations, wiring approximately $1.46 million to Thompson and Volantis for purchase of Bitcoins, to its detriment.

> **Response:** Paragraph 204 asserts legal conclusions to which no response is required. To the extent a response in required, Thompson denies the allegations in paragraph 204.

205.    **Allegation:** As a direct and proximate cause of Thompson's fraud in inducement, Plaintiff has been injured in the amount currently in excess of $900,000.00 plus interest.

> **Response:** Paragraph 205 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 205.

**COUNT VI – Fraud in Fact**
(Against Thompson)

206.    **Allegation:** The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

**Response:** Thompson repeats and realleges the contents of the above paragraphs of the Answer as if set forth fully herein.

207.    **Allegation:** Thompson made multiple explicit misrepresentations in the Escrow Agreement, including without limitation that Volantis is an operating Delaware company, that Plaintiff's funds would be in safekeeping in an individual escrow account or "wallet," and that at Plaintiff's request, Volantis would return Plaintiff's funds.

**Response:** Denies the allegations in paragraph 207.

208.    **Allegation:** Thompson also made a misrepresentation in the Escrow Services Agreement that Volantis carried general business insurance with liability coverage up to $5 million. *See* Escrow Services Agreement § 4(h).

**Response:** Denies the allegations in paragraph 208.

209.    **Allegation:** Caleb and Brown reasonably relied on the misrepresentations in the Escrow Agreement, which Thompson knowingly and willfully made.

**Response:** Paragraph 209 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 209.

210.    **Allegation:** Thompson converted Caleb and Brown's funds for either his personal use, other investments, purchase of coins for other entities, or for bulk coin transactions, and failed and refused to return Plaintiff's funds.

**Response:** Paragraph 210 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 210.

211.    **Allegation:** As a direct result of Thompson's fraud in fact, Plaintiff has been injured in the amount currently in excess of $900,000.00 plus interest.

**Response:** Denies the allegations in paragraph 211.

### COUNT VII – Breach of Fiduciary Duty

(Against Thompson as Alter Ego of Volantis)

212.   **Allegation:** The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

**Response:** Thompson repeats and realleges the contents of the above paragraphs of the Answer as if set forth fully herein.

213.   **Allegation:** By entering into the Escrow Agreement, Thompson, under the guise of Volantis, assumed the obligation to act as Plaintiff's trustee and escrow agent, and thereby owed Plaintiff the duties of care, loyalty, and good faith.

**Response:** Paragraph 213 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 213.

214.   **Allegation:** Thompson knowingly and willfully breached his fiduciary duties to Caleb and Brown by failing to maintain Plaintiff's funds in safekeeping as obligated under the Escrow Agreement, using Plaintiff's funds without its permission or authority, and failing and refusing to return such funds to Plaintiff.

**Response:** Paragraph 214 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 214.

215.   **Allegation:** As a direct result of Thompson's breaches of fiduciary duties, Plaintiff has been injured in the amount currently in excess of $900,000 plus interest as well as costs and fees incurred in attempting to collect its funds.

**Response:** Denies the allegations in paragraph 215.

## COUNT VIII – Unjust Enrichment
(Against all Defendants)

216.   **Allegation:** The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

**Response:** Thompson repeats and realleges the contents of the above paragraphs of the Answer as if set forth fully herein.

217.   **Allegation:** Defendants were and are unjustly enriched by $400,000 at the expense Caleb

and Brown and have failed to return such funds after multiple demands.

**Response:** Paragraph 217 asserts legal conclusions to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 217.

218.    **Allegation:** Caleb and Brown seek disgorgement of the amounts by which Defendants were unjustly enriched.

**Response:** Denies the allegations in paragraph 218.

**COUNT IX – Breach of Implied Covenant of Good Faith and Fair Dealing**
(Against Thompson as Alter Ego of Volantis)

219.    **Allegation:** The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

**Response:** Thompson repeats and realleges the contents of the above paragraphs of the Answer as if set forth fully herein.

220.    **Allegation:** The covenant of good faith and fair dealing is implied in the Escrow Agreement.

**Response:** Paragraph 220 asserts a legal conclusion to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 220.

221.    **Allegation:** Thompson, under the guise of Volantis, breached the implied covenant by accepting Plaintiff's funds for purchase of Bitcoins, impermissibly using such funds whether for his personal purposes or otherwise, failing to maintain Plaintiff's funds in escrow, and failing to refund the moneys to Caleb and Brown.

**Response:** Paragraph 221 asserts a legal conclusion to which no response is required. To the extent a response is required, Thompson denies the allegations in paragraph 221.

222.    **Allegation:** As a direct result of Thompson's breach of the implied covenant of good faith and fair dealing, Plaintiff has been injured in the amount currently in excess of $900,000 plus interest.

**Response:** Denies the allegations in paragraph 222.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

(i)     On Count I (RICO violations), awarding Plaintiff damages against all Defendants in an amount to be determined at trial. Plaintiff also seeks treble damages, costs and expenses incurred in this litigation and reasonable attorneys' fees to the extent allowed by law;

(ii)    On Count II (Conspiracy to Commit Rico Violations), awarding Plaintiff damages against all Defendants in an amount to be determined at trial. Plaintiff also seeks treble damages, costs and expenses incurred in this litigation and reasonable attorneys' fees to the extent allowed by law;

(iii)   On Count III (Breach of Contract), awarding Plaintiff damages against Thompson in an amount to be determined at trial but no less than $900,000.00;

(iv)    On Count IV (Conversion), awarding Plaintiff damages against all Defendants in an amount to be determined at trial but no less than $900,000.00;

(v)     On Count V (Fraud in Inducement), awarding Plaintiff damages against Thompson in an amount to be determined at trial but no less than $900,000.00;

(vi)    On Count VI (Fraud in Fact), awarding Plaintiff damages against Thompson in an amount to be determined at trial but no less than $900,000.00;

(vii)   On Count VII (Breach of Fiduciary Duty), awarding Plaintiff damages against Thompson in an amount to be determined at trial but no less than $900,000.00;

(viii)  On Count VIII (Unjust Enrichment) awarding Plaintiff damages against all Defendants in an amount to be determined at trial but no less than $900,000.00;

(ix)    On Count VII (Breach of Implied Covenant of Good Faith and Fair Dealing), awarding Plaintiff damages against Thompson in an amount to be determined at trial but no less than $900,000.00.

**Response:** Denies that Caleb and Brown is entitled to the relief requested in the "Wherefore" clause of the Complaint, including each sub-paragraph therein.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

1.     The Complaint is barred for failure to state a claim.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

2.     The Complaint is barred because the Escrow Agreement contains a binding arbitration clause which states that "any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in Philadelphia, Pennsylvania administered by JAMS."

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

3.     The Complaint is barred, in whole or in part, by the recklessness, gross negligence, negligence, breaches of contractual duties and/or other culpable and/or illegal conduct of Plaintiff and its agents, which conduct contributed directly to and caused the loss alleged in the Complaint, if any.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

4.     Upon information and belief, if Plaintiff suffered the damages alleged in its Complaint, these damages were as a result of an independent superseding act by a third party for which Thompson cannot be held liable, and Thompson's conduct was in no way the proximate cause of such damages.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

5.     The damages claimed by Plaintiff were not proximately caused by the conduct of Thompson.  To the extent that Plaintiff has not suffered any damages as a direct or proximate cause of Thompson's actions or inactions, Plaintiff may not recover any damages against Thompson.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

6.     The Complaint is barred, in whole or in part, by the principles of waiver, ratification, res judicata and/or estoppel.

## AS AND FOR AN SEVENTH AFFIRMATIVE DEFENSE

7.     The Complaint is barred for Plaintiff's failure to perform a condition precedent.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

8.      The Complaint is barred, in whole or in part, by the principle of laches.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

9.      The Complaint is barred, in whole or in part, by the doctrine of unclean hands.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

10.     Plaintiff suffered no damages and therefore it cannot maintain the Complaint.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

11.     Plaintiff's claims for damages are speculative and therefore not recoverable.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

12.     If Plaintiff suffered damages as alleged, then Plaintiff failed to mitigate such damages.

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

13.     At all times material hereto, Thompson acted in good faith and in compliance with the law.

## AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE

14.     The Court does not have personal jurisdiction over Thompson.

## AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE

15.     The Escrow Agreement contains an exclusive forum selection clause requiring litigation in the "federal or state courts located in Philadelphia County, Pennsylvania."

## AS AND FOR A SIXTEENTH AFFIRMATIVE DEFENSE

16.     The arbitrability of these disputes are for the JAMs arbitrator, not for the Court, to decide.

## RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES

17. Thompson reserves any and all rights to plead additional affirmative defenses.

**WHEREFORE**, for all of the foregoing reasons, it is respectfully requested that Plaintiff's Complaint be dismissed in its entirety, that Thompson be awarded the costs and disbursements of this

action, reasonable attorney's fees, and such other and further relief as this Court may deem just and proper.

Dated:  July 2, 2021          */s/ Eric Rosen*
        New York, NY          Eric Rosen
                              Jordana Haviv
                              Richard Cipolla
                              ROCHE FREEDMAN LLP
                              99 Park Avenue, Suite 1910
                              New York, NY 10016
                              Tel: (646) 437-7639
                              Fax: (646) 392-8842
                              erosen@rcfllp.com
                              jhaviv@rcfllp.com
                              rcipolla@rcfllp.com

                              *Attorneys for Defendant*
                              *Jon Barry Thompson*